María R. Delgado de Ramírez Cuerda, Plaintiff and Appellant,
v. Enrique Marchese Lajara, Defendant and Appellee.

No. 5487.   Argued June 9, 1931.—Decided December 20, 1932.

*Ildefonso Freyre* for appellant.   *José D. Rodríguez* for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the Court.

María R. Delgado de Ramírez Cuerda filed the complaint in this action on July 1, 1927, in the District Court of Mayagüez. It alleged that she owned, by inheritance, a house in Lares, which is described, and that since 1914 the defendant Enrique Marchese has been in possession of it, without any right or title thereto, in bad faith, unlawfully and against the will of the plaintiff.

The defendant demurred to the complaint and moved for a change of venue to the district court for the district where the real property sought to be recovered was located, that of Aguadilla. The motion was granted, and the District Court of Aguadilla overruled the demurrer. The defendant then answered denying generally the allegations of the complaint, which is not verified, and set up as new matter in opposition that he is the owner of the house and lot described in the answer, located in Lares; that he acquired the lot by purchase from the municipality and built the house with his own money; that years ago there was on the lot a house in ruinous condition, which the defendant understands was sold by the plaintiff; that he sold the property to Pablo Calcerada and later reacquired it.

There is no doubt that both pleadings refer to the same property. However, certain differences may be noted in the description. For example, the lot is described in the complaint as having a frontage of 11 meters and a depth of 36, and in the answer as having a frontage of 12.50 meters and a depth of 15. The complaint gives the house a frontage of 10.50 meters and a depth of 19, while the answer describes it as 11.50 meters in frontage and 14 meters in depth. Both the complaint and the answer speak of a two-story house, the complaint specifying that the first story is made of masonry, wood, and zinc, and the second of wood, that it was, formerly roofed with tile and now with zinc. The answer does not state the materials of which the house is built, except that it has a zinc roof.

The case went to trial on the above issues.

The plaintiff's evidence consisted in her own testimony, that of José D. Irizarri, Francisco Marcano, Monserrate Delgado, Pedro Aramburu, Ramón Alicea, J. B. Soto, and Arcadio Ramírez Cuerda, and a copy of the will of Agustina González, to which the defendant was a witness.

The will shows that Doña Agustina devised to her granddaughter, the plaintiff, the bare legal title to the house described in the complaint, and the testimony of the witnesses tends to show that, upon the death of the grandmother in 1912, full title to the property passed to the granddaughter.

On this point the granddaughter testified that she actually took possession of the house, that Cándida Salcedo lived in the upper story, that there was a printing office and a barbershop in the lower story, and that they all paid rent to her; that she was in possession until May, 1914; that since 1914 Marchese, the defendant, has been in possession; that she did not sell to Marchese, nor has she assigned her rights to anyone. The plaintiff also testified that on several occasions, personally and through her husband, she has required Marchese to return possession to her, and that he has refused. She does not explain how Marchese entered into possession.

The plaintiff's oral evidence also tends to show that the house described in the complaint might have been worth about $2,000 in 1914, and that it is the same house which is described in the answer, having been altered and repaired, but not rebuilt.

The question of plaintiff's age arose several times during the course of the testimony, but no decisive emphasis was placed thereon. When the granddaughter was mentioned in the will her age was not stated.

At this stage, defendant presented his evidence, consisting of his own testimony, that of the witnesses José León, Jr., Baltazar Márquez, Bernardo Suau, and the plaintiff's, and several copies of public deeds which we shall mention when referring specially to them. What did this evidence show?

The documentary evidence showed the following:

On October 1, 1913, before notary Paz Urdaz, the partition of the estate of Agustina González was effected. Among the parties to it appears the plaintiff, who is described as follows: "Doña María Ramona Delgado Santiago, fully twenty-one years of age, single, without a profession, resident of Lares", and in it the bare legal title to the urban property (the house in question) valued at $1,200 was awarded to her. The notary asserts that the deed was read to the parties, who expressed their conformity, ratified and signed it.

On April 18, 1914, before Notary Acevedo, appeared Delfín Delgado and the plaintiff, who is referred to as "Doña María Ramona Delgado Santiago, twenty-one years of age, housewife, resident of Lares, married to Don Angel Rivera." The notary asserted that he knew the parties, who in his judgment had the legal capacity sufficient to execute the document, by virtue of which Delfín Delgado waived in favor of the other party, his daughter, his life estate in the house in question, which had been awarded to him as a result of the partition of the estate of his mother Doña Agustina. The plaintiff accepted and thanked her father for his liber-

ality.   The notary asserts that he read the deed to the parties and witnesses, all of whom signed it.

On May 16, 1914, before Notary Rodríguez, appeared the plaintiff, identified as "of the one part the vendor Doña María Ramona Delgado Santiago, twenty-one years of age, without a profession, married to Don Angel Rivera," and Enrique Marchese Lajara, the defendant, who appeared as the purchaser.   The plaintiff's husband also appeared.   In the deed the plaintiff purports to sell to the defendant the house described in the complaint, for the price of $1,600, which the plaintiff "acknowledges having received to her satisfaction prior to this act, wherefore she gives Mr. Marchese a full and effective receipt."   Plaintiff's husband made it appear in the deed that "Although it is not necessary for this sale that Don Angel Rivera give his consent to his wife, he wishes to state that it has been made with his approval."   The end of the document shows that the notary read it to the parties and witnesses, that the former ratified it and all signed it.

Copies of other public deeds show that the defendant, who previously held the usufruct of the lot on which the house is located, acquired full title to the lot from the Municipality of Lares; that on February 14, 1918, he sold the property to Pablo Calcerada for $3,100 and on February 27, 1924, he repurchased it from Calcerada for $2,900.

The oral evidence dealt with the purchase of the house, and with its repairing, transformation, or rebuilding.

Witness Márquez asserted that back in 1914, the plaintiff owned a house which was not tenanted, shut down by the health authorities; that is was offered for sale to him and he did not care to buy it; and that the defendant then bought it, the plaintiff paying a price of $1,600.   And witness Suau asserted that the plaintiff sold defendant the house, and that she received the purchase price herself.   Both Suau and Márquez were witnesses to the contract which were made to appear in the public deed of May 16, 1914.

The defendant testified in part as follows:

". . . because it happens that the house I bought from her was destroyed; that house was destroyed; the supporting timbers were removed; the side walls were of clay, stone and pieces of brick, and were full of holes; those walls were in ruins when I bought the house, which was first offered to me by Doña María Delgado's husband and I did not want to buy it, and later she offered it to me and somebody told me it was a good proposition and I bought the house, which was shut down by the health authorities as untenantable; then I contracted for the repairs, and I asked them to draw me a plan, which was done by Francisco Levy González, who had done it for her . . . When that house was destroyed it was necessary to take away the supporting timbers, we had to remove them, for the house had two wings and everything was removed and a square house was erected, and then I asked the municipal government to grant me the lot . . . I asked the municipal government to grant me the usufruct of the lot and the certificate of property where I built the new house; that is not a repaired house."

Called as a witness for the defendant, the plaintiff testified that she married Angel Rivera in February, 1914; that he died and she then married Ramírez Cuerda.

Witness León Jr. was the builder who worked on the house. He testified in part as follows:

"The changes made were that the walls were knocked down, the house was enlarged on the side of the Municipal building and was brought up to the line; a zinc fence was put up; more light was provided for the lower story, for it was too low; it was not more than eight and a half feet high and the health authorities require a minimum of ten feet to make a house tenantable, and a concrete floor was put in, where it formerly had a wooden floor, and it was shortened toward the back and left at fourteen meters, and instead of having the wing it had, it was all made in a rectangular body, eleven and a half meters in front by fourteen in depth, and it has a zinc roof, with four slopes . . . More than three thousand dollars was spent in the reformation; the house was made completely new; the house had no light, and it had to be built with sufficient light, for the health authorities had shut it down; the

lower story had very little light; even now it has less than ten feet of light; that house, with such a frontage, should have more light; the house was extremely low and was built of shingles and clay tiles.''

When the defendant offered in evidence the contract of purchase from the plaintiff, the latter objected ''inasmuch as this is a surprise to the plaintiff'' in view of the manner in which the answer was drafted. The court decided the point as follows:

''It appears from the answer that each and every allegation of the complaint is denied, a general denial having been made and new matter alleged in opposition to the complaint covering other matters touching on the question. The Court holds that this evidence may be admitted under the general denial, but inasmuch as the plaintiff, as the Court has already indicated, may not be surprised, she has always the right to rebut this evidence, or to present evidence with respect to the nullity of this contract; once the matter is brought up, the way is open for the plaintiff to present her evidence with respect to the nullity of the contract, and once she has done so she might also, if she deems it convenient, request leave to amend the complaint to conform with the evidence. The Court admits this document, as it will admit evidence against this document, regarding the capacity of the parties or its nullity.''

The trial closed with the testimony of the plaintiff, offered in rebuttal, and the presentation of a certificate of the Civil Registry of Lares. The defendant objected to the admission of this certificate because the birth was recorded in 1920; because the question of plaintiff's age was not raised in the complaint; because even if it had been raised there would not be a cause of action according to the decision in *Heirs of Rivera* v. *Hernández et al.,* 31 P.R.R. 768, and because the sale was made by the plaintiff with the consent of her husband. The court decided the question as follows:

''The court will admit the certificate as it is, to be given such probative value as it may have, after studying whether it is really self serving evidence and all the other questions relative to the case.''

The record was made in 1920. In its pertinent part it literally reads as follows:

"Number 418.—María Delgado y Santiago.—The undersigned Clerk of the Civil Registry states: That this record is made by virtue of the Order of the District Court of Aguadilla, P. R. dated April 9, 1920, and which I have before me, as I certify.—Dr. Agustín Diez. —In the center.—Birth Certificate.—In Lares, P. R., on April 13, 1920, at eleven o'clock in the morning, by virtue of the statement made before me by Celestina Santiago, of legal age, widow, without a profession, born in Camuy, P. R. and a resident of ward Buenos Aires, municipality of Lares, P. R., I, Agustín Diez Gutiérrez, Clerk of the Civil Registry, proceed to execute this birth certificate for the purpose of recording:—1.—That on April 11, 1897, at seven o'clock in the morning and in her dwelling in the ward of Buenos Aires, Lares, P. R., there was born a white girl, who was named María."

The plaintiff testified that on the date of the deed of sale she was seventeen years of age, and in answer to the question whether she knew why her birth appeared recorded in 1920, she said:

"Because formerly it was the custom to have us baptized, and only make a note of it in church, and when father died, having left a will, then the attorney when making a partition of the property had our births recorded; this was when father died, having left a will, but our births already appeared in the church registry."

The plaintiff requested leave to amend her complaint to conform with the evidence, by alleging "the nullity of the title of Marchese, if he had any title." The defendant objected. The judge gave the reasons for his decision at length, and concluded by saying:

"This evidence which the court admitted as a consequence of the deed of sale was objected to by the defendant, and exception taken to its admission, the defendant expressly and definitely opposing the admission of evidence that plaintiff was an infant; and the Court believes that since this is an amendment relative to fundamental evidence which determines a new cause of action, namely that of nullity of the contract of sale; and since that evidence, producing such fundamental effects, was objected to by the defendant, the

Court repeats that in this case to permit the amendment would be to go beyond the proper exercise of judicial discretion and into the field of abuse of such discretion, and therefore denies plaintiff's motion for leave to amend her complaint to conform with the evidence in question . . . ''

The plaintiff insisted on her motion for leave to amend and the judge said:

''Then the court will reserve decision in this case, and allows the parties ten days to file briefs simultaneously.''

On April 22, 1930, the court rendered judgment for the defendant, with costs. The plaintiff appealed and in her brief assigns nine errors as committed by the court: 1, in giving no probative value to the birth certificate; 2, in refusing leave to amend the complaint; 3, in holding that the amendment changed the cause of action; 4, in holding that plaintiff could not introduce evidence of the inexistence of defendant's title; 5, in holding that the repairs amounted to a reconstruction; 6, in holding that the plaintiff had capacity to sell when seventeen years of age; 7, in allowing defendant to introduce evidence of the alleged sale and then refusing to consider the evidence of the plaintiff with respect to its nullity; 8, in rendering judgment for defendant on the basis of the evidence taken; and 9, in not rendering judgment for the plaintiff.

In our judgment, the plaintiff did not present the issues frankly, nor did the defendant meet them frankly. This confused the district court on several occasions, but since the judgment rendered by it definitely disposes of the case, and the record contains the elements necessary to consider and decide all the questions involved, we shall go to the merits of the case and decide it according to the facts which we may find to be proved and to the law which may be applicable.

As we have already stated, the plaintiff alleged that she owned the house in question and that the defendant was in possession since 1914 without any right thereto. The com-

plaint is not verified, and the defendant filed a general denial and alleged, among other things, that it was his understanding that plaintiff had sold a house in ruins which formerly existed on the lot. Would it not have been much clearer to refer from the beginning to the deed of sale of May 16, 1914, the plaintiff maintaining the inexistence of the contract appearing from that deed, on the ground that the vendor was an infant, and the defendant relying on the deed as the basis of this title?

Nevertheless the question is not important, in our judgment, for the pleadings are such as to permit the defendant to introduce the said deed in evidence, and the plaintiff to show that she was a minor at the time the deed was executed, without the necessity of amending the complaint to conform with the evidence. If the contract is inexistent, plaintiff could well allege that she did not sell, and if the contract was executed as a matter of fact, and has come to exist as a matter of law by virtue of the surrounding circumstances, the defendant could well rely on it.

The situation having been cleared in the above manner, let us examine the facts and surrounding circumstances as they appear from the pleadings and the evidence.

Let us begin with the plaintiff's age. She testifies that she was seventeen in 1914. Her birth certificate indicates that she was born on April 11, 1897. A simple arithmetical operation shows that, in accordance with the civil registry, the plaintiff actually proved that she was seventeen when the deed of sale was executed in 1914.

It is undoubtedly significant that the record was not made within a short period of time after the birth, as the law requires, but twenty-three years afterward. And there is no question that it would have been more persuasive to have presented in evidence a copy of the court order by virtue of which the record was made, in order that the nature and grounds of the order might be known, and a copy of the baptismal record on which, according to the plaintiff, her

lawyer relied to record the birth at the time of the partition of her father's estate, but aside from all this it must be acknowledged that the record exists and was not controverted, and that all ulterior considerations in this case must rest on the basis that the plaintiff was seventeen years of age in 1914.

She was seventeen in 1914, according to the facts legally established in this case, but the evidence also shows that in 1913 she appeared before notary public Paz Urdaz and stated that she was fully twenty-one years of age, and after the document wherein the notary caused this statement to appear was read to her, she ratified it and signed it, that in 1914, after her marriage, she again appeared, together with her father, before another notary public, Acevedo, and again affirmed that she was twenty-one, and accepted her father's donation to her of his life estate in the house involved in the case, thanked him for his liberality and signed the document wherein this was made to appear, after it had been read to her, and that several days later, in May, 1914, together with her husband, she appeared before a third notary, Rodríguez, and reiterated her statement that she was twenty-one years of age, selling to the defendant the house which she now claims for the sum of one thousand six hundred dollars which she acknowledged having received to her satisfaction, and ratifying and signing the document after the notary had read it to her.

Of her own free will this plaintiff represented that she was twenty-one in three public deeds executed within a year, from October 10, 1913, to May 16, 1914, before three different notaries, in the first together with all the members of her family, in the second together with her father, and in the third with her husband, and no one called attention to the falseness of her representation. Her appearance, then, must have been that of a person who was of age, unless we are to conclude that all of them were in collusion to conceal the truth.

The record tells us more with respect to the personality of the plaintiff. She herself testified that since 1912, she took possession of the house and dealt with the tenants, who paid her the rent, and witnesses Márquez and Suau testified that the defendant páid the purchase price of $1,600 to the plaintiff herself. It was her husband, and later she herself, who proposed the transaction to the defendant.

Seldom has there been presented to the courts a stronger case of representation on the part of an infant that he is of age and has capacity to contract with a third party who relies on him and contracts with him as if he were of age. There is not the slightest showing that the purchaser was aware that he was dealing with a minor. In order to ascertain the vendor's title, the purchaser should naturally have examined the deeds of partition and donation of 1913 and 1914, and from them he could have noticed only that the vendor was of age. It was natural that he should have accepted her statement in the deed of sale, particularly since she appeared together with her husband, who expressly made known his consent to the transaction.

The fact that the defendant, in 1912, was a witness to the will of the grandmother, has no implication. We have already said that the granddaughter was named in that document without mention of her age.

The price paid was reasonable. The property was valued at $400 less in the deed of partition, and the plaintiff's own witnesses tended to show that it was worth $2,000, that is, $400 more.

The contract was performed in fact. The purchaser immediately entered into full possession of the house he acquired, and invested in it more money than he paid originally for it. It may be that he did not entirely rebuild it, but it is clear that he repaired and transformed it considerably. He also purchased the lot on which it is located,

and dealt with the property as its owner, selling it to a third party and then repurchasing it.

It is after all this had happened, after the father who donated his life estate and the husband who expressly consented to the sale have died, when another husband has taken his place and nine years have elapsed since she became of age, in accordance with her own evidence, that the plaintiff brings this action asking the court to hold that she is the exclusive owner of the house and to order the defendant to surrender possession to her and pay the costs, expenses and attorney's fees of the case.

What is the law applicable to such a situation? This Court has stated it on two occasions; the first in the case of *García et al.* v. *Garzot,* 18 P.R.R. 835, the second in *Heirs of Rivera* v. *Hernández, supra.*

In *García* v. *Garzot, supra,* this Court expressed itself as follows:

"At the time the deeds were executed Paxot, according to the documents which he himself exhibited, was 23 years of age; and according to the documents offered in this suit by his heirs, he had already completed his 22d year—that it to say, one year more than the law at present requires for the attainment of majority. Moreover, Paxot was at that time a married man and had children and the right to manage his property. He died nearly four years after the deeds were executed having made no claim whatever against the defendant. This claim was entered by his heirs 10 years after his death. There is not the slightest evidence to show that the defendant knew that Paxot lacked a few months of attaining his majority or that Paxot was in any way prejudiced by the transaction effected.

"Under such circumstances would it be possible now for a court of justice to render a judgment sentencing the defendant to pay again a debt already satisfied plus the interest, the whole amounting to some $16,000?

"A negative reply forces itself upon us and it is a reply which is in conformity with the jurisprudence laid down by the Supreme Court of Spain in its judgment of April 27, 1860, declaring that 'sales of real property made by minors are valid when they feign to be over 25 years of age and induce the other parties to the contract to believe that they are of that age by reason of the fact that

they are nearly so, are married and have the management of their property, or by other special circumstances that may exist.'

"The only difference that may be observed between the case decided by the Supreme Court of Spain and the one at bar is that in the latter the fact that Paxot feigned to be of age when he appeared to execute the deeds has not been shown; but although this may be true the fact was proven that Paxot personally requested that his baptismal certificate, which stated that he was born on February 1, 1872, be recorded; that he also personally appeared on two occasions before a notary public and affirmed that he was of age, presenting for the purpose a certified copy of his baptismal certificate and his *cédula* (certificate of identification), and that therefore he knowingly or unknowingly induced the defendant Garzot to consider him as being of age and to pay him his debt, and it cannot be said that in acting thus the defendant, under all the circumstances of this case, failed to act as a man of prudence.

"The question in its second aspect is therefore decided as follows: Considering all the circumstances of this particular case the deeds canceling the mortgage to which this suit refers should be held to be valid and effective, and, therefore, that the payment made in good faith by Garzot to Paxot, who was in possession of his credit, freed the former from the debt which he had contracted with the latter. Art. 1164 of the Spanish Civil Code and 1132 of the Revised Civil Code."

And in *Heirs of Rivera* v. *Hernández, supra,* the Court said:

"As to the transfers made by Prudencia and Regalada in 1905 and 1908 when they were 20 and 19 years of age, respectively, according to their birth certificates, although we did not then consider the validity of their conveyances, it is well to say now that as both of them stated in the deeds of conveyance to Hernández that they were of age, they having nearly attained their majority and not having brought within four years after attaining their majority the action of nullity authorized by section 1268 of the Civil Code, the said conveyances were validated and, therefore, Hernández acquired the rights that they had. Contracts made by minors who represent themselves to be adults when they have nearly attained their majority, are not void but voidable."

We realize that perhaps we may be going too far in applying the above rule to the case of a minor seventeen years of

age, but the surrounding circumstances are so peculiar that it seems to us that justice requires its application.

The very fixing by the legislator of the age which a person must attain in order to be considered as having reached full majority shows that different criteria have existed. Prior to the Civil Code of 1889, majority was not attained until a person was twenty-five; according to the Civil Code of 1889, the age of twenty-three was sufficient; and according to the Revised Civil Code, twenty-one is sufficient: a difference of four years.

Although the development of personality has always been taken into account, it must be admitted that there is something arbitrary in fixing the age of majority. It is fixed because there must be certainty with respect to such an important matter, but this does not imply ignorance of the fact that there are differences in the development of human personalities. There are persons who at seventeen think better, and have a stronger and more complete personality, than others at twenty-one.

The rule is that a contract executed by an infant is void, for the law does not accept his capacity to contract, but when the infant appears to be of age, and the other party to the contract acts in the belief that he is, in good faith, and it is a real and fair transaction which was carried out in fact and which openly subsists through the years, the contract is not inexistent.

It may well be maintained that the cases have but continued to interpret the facts and the law in the light still cast, through the centuries, by the code prepared under the direction of King Alfonso the Learned. Law VI, Title XIX, of the Sixth *Partida* states:

"Law VI.—*For what reasons restitution can not be granted to a minor.* Where a minor says and represents that he is over twenty-five years of age, and if he should seem to be that age, and does so deceitfully, the contract so made with him shall be valid, and should not later be set aside upon his saying that he was not of

age when he made it, for the law helps the deceived and not the deceiver. The same shall hold where a youth over fourteen swears that the sale, or contract or agreement made with another will not be avoided by him on the ground that he was not of age; for after swearing thus his oath should be kept. Moreover we say that if a person less than twenty-five should ask a judge to order restitution for property lost or damaged by reason of a contract made before he was of age, and a judgment should be rendered against him because it was not as he had complained, he may not later sue for restitution of the same thing before that judge or any other, unless he should appeal from the judgment, or show new and sufficient reasons therefor. And we further say that if a minor under twenty-five years of age should bring suit, with the consent of his guardian, claiming someone as his serf, if judgment should go against him, declaring the defendant free, he can not later ask restitution for such a judgment because he was a minor when he sued, and this is so because of the advantage which the laws give to freedom. And we also say that if the contract or agreement for which the minor may ask restitution should be made in such manner as a man of age and good understanding would have made it, and not have considered himself deceived thereby, then it shall not be set aside on the ground that he made it while under age, for he who seeks restitution must always show two things, one that he was under age at the time of making the contract or agreement, the other that he made it to his injury and detriment.''

The judgment appealed from should be affirmed.

Mr. Justice Hutchison dissented.

Mr. Justice Córdova Dávila took no part in the decision of this case.